ENTERED

JUN 2 2 2005

U.S. BANKRUPTCY COURT
MDNC - BB

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE:                                    )
                                          )
DEEP RIVER WAREHOUSE, INC.,               )          Case No. 04-52749
                                          )
          Debtor.                         )
_____)

## MEMORANDUM OPINION

This matter came before the Court for hearing on May 18, 2005 on the Objection to Claim Number 4 of GMAC Commercial Mortgage Corporation (the "Objection to Claim"), filed by Deep River Warehouse, Inc. (the "Debtor") on April 13, 2005, and the Motion to Determine Claim, filed by GMAC Commercial Mortgage Corporation ("GMAC") on April 13, 2005. At the hearing, the Debtor was represented by Robert E. Price, Jr., GMAC was represented by Alan D. McInnes, and the United States Bankruptcy Administrator was represented by Robyn C. Whitman.

Based upon a review of the Objection, the Motion, the evidence presented at the hearing, the arguments of counsel, and a review of the entire official file, the Court makes the following findings of fact and conclusions of law:

### A. FACTS

1.     In 1997, Scott L. Gwyn ("Gwyn"), the sole shareholder/owner of the Debtor, built a warehouse located at 615 Pegg Road in Greensboro, North Carolina (the "Property"), that is the sole asset of the Debtor.

2.     On June 5, 1997, the Debtor executed a Promissory Note, Deed of Trust and Security Instrument, and Assignment of Rents (the "Loan Documents") with Dynex Commercial, Inc. ("Dynex"), the predecessor of GMAC. The principal amount of the Promissory Note was

$2,800,000.00, and it required monthly payments of $22,782.71 by the Debtor. The non-default interest rate was a fixed rate of 8.625 percent per annum.

3.      On June 5, 1997, Dynex assigned the Loan Documents to GMAC.

4.      The evidence is controverted as to the date that the Debtor defaulted on the debt to GMAC. The records of GMAC show that the Debtor failed to make the payment due in April of 2003. Gwyn testified that the Debtor made its last pre-petition payment to GMAC in May of 2003 and that the Debtor was current on the debt through that month. The Court finds the records of GMAC persuasive on the issue.[1] The Debtor failed to make the April, 2003 payment and that is when the Debtor defaulted on the debt to GMAC.

5.      On September 22, 2004 (the "Petition Date"), the Debtor filed a Chapter 11 bankruptcy petition.

6.      On December 23, 2004, the Debtor filed a Chapter 11 Plan and Disclosure Statement. The Disclosure Statement states that the debt to GMAC totaled $3,022,072.00 on the Petition Date.[2]

7.      On January 18, 2005, GMAC filed a proof of claim for $3,148,250.00 plus any applicable interest, fees, and costs.

8.      On March 14, 2005, the Court determined, in the context of a motion for relief from stay filed by GMAC, that the Property was worth $3,100,000.00.

9.      On April 13, 2005, GMAC filed an Amended Proof of Claim (the "Proof of Claim")

---

[1]The records of GMAC were detailed and precise, and the Debtor presented no evidence to the contrary other than Gwyn's testimony, which was not supported by any written records. If records supporting Gwyn's testimony exist, such as cancelled checks showing the April, 2003 and May, 2003 payments, then it was incumbent upon the Debtor to present them.

[2]The Debtor filed four amended disclosure statements thereafter, but the stated amount of GMAC's claim remained the same.

alleging that the Debtor owed GMAC $3,418,015.69 as of the Petition Date.

10.     On April 13, 2005, GMAC filed the Motion to Determine Claim, and the Debtor filed the Objection to Claim. Both pleadings request the Court to determine the claim of GMAC.

11.     On May 13, 2005, the Debtor filed a Fifth Amended Disclosure Statement (the "Disclosure Statement"). The Court approved the Disclosure Statement as modified in open Court on May 18, 2005.

## B. BURDENS OF PROOF

"A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a); In re Carrazco, No. 02-52925, 2003 WL 22231720 (Bankr. M.D.N.C. 2003). The evidentiary effect of a proof of claim is established in Bankruptcy Rule 3001(f), which provides that a properly filed and executed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Stancill v. Harford Sans, Inc. (In re Harford Sands, Inc.), 372 F.3d 637 (4th Cir. 2004); Fed. R. Bankr. P. 3001(f). However, the claimant is only entitled to have the claim considered "prima facie valid" if the claimant alleges facts sufficient to support the claim. Stancill, 372 F.3d at 640; Carrazco, 2003 WL 22231720 at *4 (citing In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3rd Cir. 1992)). The burden of proof then falls upon the debtor to overcome the presumed validity and amount of the creditor's claim. Stancill, 372 F.3d at 640; Carrazco, 2003 WL 22231720 at *4. The debtor, however, is not required to disprove the claim. Stancill, 372 F.3d at 640; Carrazco, 2003 WL 22231720 at *4 (citing In re Kahn, 114 B.R. 40, 42 (Bankr. S.D.N.Y. 1990)). "Once the debtor presents evidence to rebut the prima facie effect of the proof of claim, the ultimate burden falls upon the claimant to prove the validity and amount of its claim by a preponderance of the evidence." Stancill, 372 F.3d at 640; Carrazco, 2003

WL 22231720 at *4 (citing <u>Allegheny Int'l, Inc.</u>, 954 F.2d at 174).

## C. ANALYSIS

The Proof of Claim filed by GMAC in the Debtor's bankruptcy proceeding alleges that the Debtor owed GMAC $3,418,015.69 on the Petition Date. The Debtor objected to the Claim and alleged that it only owed GMAC $2,964,330.08. In a March 14, 2005 ruling, the Court determined that the value of the Property was $3,100,000.00.[3] The Disclosure Statement states that GMAC has no unsecured claim, but places any unsecured claim of GMAC in a class separate from the class of general unsecured creditors. At the hearing on the Disclosure Statement, GMAC objected to, inter alia, the separate classification of its unsecured claim. Thus, a determination of the existence and amount of GMAC's unsecured claim may have consequences for the confirmation of the Debtor's proposed plan of reorganization.

The indebtedness owed to GMAC is divided by the Proof of Claim into ten separate components. Each component will be addressed by the Court.

1.    <u>Current Principal Balance</u>

The Proof of Claim of GMAC states that the outstanding current principal balance due is $2,563,671.12. This amount is not disputed by the Debtor and is accepted by the Court.[4]

---

[3]<u>In re Deep River Warehouse, Inc.</u>, Case No. 04-52749, slip op. at 27 (March 14, 2005).

[4]Two post-petition adequate protection payments of $17,500.00 each have been tendered to GMAC by the Debtor. The Debtor argues that this amount should be credited to the principal balance due. But these payments were made post-petition and have no bearing on the amount that GMAC was owed on the Petition Date. Moreover, Paragraph 1 of the Promissory Note states that any payments received shall be applied (a) first to the payment of interest computed at the Applicable Interest Rate; and (b) the balance toward the reduction of the principal sum.

4

2.    <u>Interest</u>

GMAC asserts that the Debtor ceased making its monthly payments to GMAC on April 1,

2003.  The Debtor claims that it made the April payment and that it did not cease making payments

to GMAC until May 1, 2003.   GMAC's loan history report, however, plainly indicates that the

Debtor did not make the April payment.  The Court gives greater weight to the business records of

GMAC over the self-serving and unsupported testimony of Gwyn, and finds that the Debtor ceased

making its monthly payments on April 1, 2003.  Consequently, GMAC properly calculated the

amount of interest due on the loan from April 1, 2003 – not May 1, 2003 as contended by the Debtor.

The Debtor owed GMAC interest of  $331,673.40 as of the Petition Date.

3.    <u>Default Interest</u>

GMAC alleges that it is owed interest at the default interest rate (an additional 3% on the

outstanding principal sum accruing from the time of default) for the period of April 1, 2003 through

September 22, 2004 at $213.64 per day, totaling $115,365.60. The Debtor objects to GMAC's claim

for default interest on the basis that GMAC did not timely provide it with notice of the default; thus,

the Debtor argues that the default interest rate could not begin to accrue – notwithstanding its April

2003 default – until it was provided with notice.  The Debtor contends that it did not receive notice

until October 2, 2004, when GMAC sent the Debtor a letter that plainly stated to the Debtor that it

was in default.  GMAC contends that it was not required to provide the Debtor with notice based on

the Loan Documents.  The Court will first examine the propriety of GMAC's claim for default

interest and then determine if notice of the default was required under the Loan Documents.

a.    <u>The Default Rate</u>

Several provisions in GMAC's Loan Documents address default interest.  Paragraph 4(b) of

the Promissory Note states that default interest shall "without notice become immediately due and payable at the option of the Lender if any payment required in the Note is not paid prior to the fifth day after the date when due. . . ."  Paragraph 5 of the Promissory Note, titled "Default Interest," states that upon the occurrence of an Event of Default,[5] which includes nonpayment, the Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum at the "Default Rate."

Default interest rates are characterized as "supplemental interest charges," included in the financial contract in addition to the specified, basic interest rate.  In re Dixon, 228 B.R. 166, 172 (W.D. Va. 1998)(citing 4 Collier on Bankruptcy ¶ 506.04 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2004).  Whether interest will be allowed at the default rate is determined on a case-by-case basis and is fact specific.  Id. at 173 ("analysis of default interest rates is based on the facts and circumstances of each case.").  In fact, the only restrictions for interest terms generally are set by state law and policy.  See In re Hollstrom, 133 B.R. 538, 539 (Bankr. D. Colo. 1991).  Other jurisdictions have determined that the contractual default rate is proper where:

> (1) the creditor faces a significant risk that the debt will not be paid;
> (2) the lower rate of interest payable pre-default is shown not to be the prevailing market rate;
> (3) the difference between the default and the pre-default rates and whether the differential between the two rates are reasonable; and
> (4) whether the purpose of the higher interest rate is to compensate the creditor entitled to interest for losses sustained as a result of the fact that it was not paid at maturity or is simply a disguised attempt to penalize the debtor.

Id. at 539. See also In re Pinebrook, Ltd., 85 B.R. 160, 162 (Bankr. M.D. Fla. 1988); In re Sheppley,

---

[5]The term "Event of Default" is defined in Paragraph 10.1 of the Deed of Trust.  Section 10.1(a) states that a default shall occur "if any portion of the Debt is not paid prior to the fifth (5th) day after the same is due or if the entire Debt is not paid on or before the Maturity Date."

62 B.R. 271, 276 (Bankr. N.D. Iowa 1986); In re Johnson, 184 B.R. 570, 573 (Bankr. D. Minn. 1995).

A determination of whether pre-petition interest is allowable at the default rate is typically governed by the terms of the loan documents negotiated by the parties. The majority of jurisdictions allow, or at least give "a presumption to the allowability of, default rates of interest, provided that the rate is not unenforceable under applicable nonbankruptcy law." In re Dixon, 228 B.R. 166, 173 (W.D. Va. 1998)(citing 4 Collier on Bankruptcy ¶ 506.04[2][b][ii] at 506-114 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2004).

Courts will typically only interfere with the terms of the contract and not allow default interest when the default rate is punitive. Where the creditor includes the default rate in order to coerce performance by the debtor, rather than as a means of compensating the creditor, the default rate will be deemed a penalty. Id. (holding that a default rate of 36% was not inequitable and not a penalty where the original interest rate was 18%)(citing In re Timberline Property Development, Inc., 136 B.R. 382 (Bankr. D.N.J. 1992)). The Court has considered several factors, including the size of the loan, the nature of the collateral, the proportion of the default rate to the non-default rate, the commercial nature of the loan, and the sophistication of the parties. The Court concludes that the default rate of three percent is reasonable and appropriate.

      b.    Notice of Default

The Debtor argues that GMAC cannot charge default interest until after GMAC gave the Debtor notice of its intent to charge default interest. The Debtor cites two cases in support of its assertion. In the case of In re Crystal Properties, 268 F.3d 743, 744 (9th Cir. 2001), the lender filed a proof of claim asserting a right to interest at the default rate. The loan documents in Crystal

Properties contained language almost identical to the Loan Documents of GMAC; they allowed the lender to charge default interest without notice with one significant difference -- the default interest clause in Crystal Properties was included in the acceleration clause. The creditor, like GMAC, argued that default interest was due and payable upon default "without notice or demand," and that the default rate should begin to accrue the moment the debtor defaulted. See id. at 748. The court said that "a written contract must be read as a whole and every part interpreted with reference to the whole." Id. (citing Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir. 1989)). Further, the court determined that every provision of the contract must be given full meaning and effect to avoid a construction that focused only on a single provision. Id.

The Crystal Properties court, analyzing the contract, found that the option to accelerate must be exercised before the default interest could accrue because the contract said that once the option to accelerate was exercised, the notes would "thereafter bear interest . . . at the increased rate . . ." The use of the word "thereafter," according to the court, could only mean that the default interest rate did not become effective unless the note holder exercised its right to accelerate. Id. The reasoning behind the court's refusal to allow interest at the default rate in Crystal Properties was not because the lender did not give notice of the default; it was because the lender did not perform the affirmative act of putting the debtor on notice that it intended to accelerate the debt. Id. at 749 (holding that courts have made clear the unquestionable principal that, even if the terms of the note do not require notice as a prerequisite to acceleration, the holder must take affirmative action to notify the debtor that it intends to accelerate). The Debtor's reliance on Crystal Properties is misplaced inasmuch as Crystal Properties did not hold that notice must be given before default interest can be charged against a debtor.

8

The Debtor also cited <u>United States v. Neudai</u> 14 F.3d 598 (4th Cir. 1993)(unpublished), in support of its contention, but <u>Neudai</u>'s holding is virtually identical to that of <u>Crystal Properties</u>; the terms of the loan documents at issue dealt with acceleration of the debt, and there was no separate provision for charging default interest. <u>Neudai</u> does not hold that notice must be given in order for the lender to charge default interest.

The Court must read the terms of the Loan Documents in context, giving each term its plain meaning. <u>See</u> 11 <u>Williston on Contracts</u> § 32:3 (4th ed. Richard A. Lord 2004)(citing <u>Restatement (Second) Contracts</u> § 202(3)(a)(stating that the "plain, common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to them")). The Loan Documents contain two separate paragraphs allowing GMAC to charge default interest "without notice" if any payment required in the Promissory Note is not paid. Paragraph 4(b) states that default interest shall become due immediately if any payment required by the Promissory Note is not paid prior to the fifth day after the date when due. Paragraph 5 of the Promissory Note states that the Lender shall be entitled to receive interest at the default interest rate on the entire unpaid principal sum upon the occurrence of an Event of Default. Paragraph 10.1(a) of the Deed of Trust defines an Event of Default as, among other things, the failure to make a required payment. Unlike the cases cited by the Debtor, these paragraphs on default interest are not connected with any paragraphs on acceleration of the debt and cannot be read in conjunction therewith. Accordingly, nothing in the parties' contract required GMAC to give the Debtor notice that it would charge default interest.

The Debtor and GMAC are both sophisticated parties, and they entered into the Loan Documents as part of an arm's length transaction in which both had the benefit of legal

representation. The default rate of interest is three percent (3%), which is reasonable under the facts of this case. The terms of the Loan Documents will be given their normal meaning and effect. GMAC will be allowed a claim for default interest, which shall accrue from the date of default.[6] Based on the plain language of the Loan Documents, the Court concludes that notice of that default is not relevant.[7]

GMAC calculated the accrual of default interest from April 1, 2003. Paragraph 4 of the Note states that default interest is payable "if any payment required in this Note is not paid prior to the fifth (5th) day after the date when due. . . ." Consequently, no default interest is due from April 1, 2003 to April 5, 2003, and default interest did not begin to accrue until April 6, 2003. Therefore, the Court will deduct $1,068.20 from the amount of default interest charged, and shall allow a default interest claim in the amount of $114,297.40 as of the Petition Date.

4.    Prepayment Premium and Release Fee

GMAC alleges that the Debtor owes a prepayment premium of $201,893.13 and a release fee of $12,818.36 based on the Debtor's default. The Debtor challenges these fees as unauthorized by the terms of the Loan Documents because the normal conditions precedent for such fees to be assessed against the Debtor have not occurred.

Paragraph 6 of the Promissory Note allows the Debtor to make prepayments to GMAC

---

[6]The Court has previously determined herein that the date of default was April 6, 2003.

[7]GMAC introduced evidence that it sent the Debtor a letter on October 3, 2003, entitled "Notice of Default," which contained the following language "you are hereby notified that certain payments of principal and interest are past due and delinquent under the Note, and as a result you are in default under the Note and the Loan Document." The letter, however, was addressed to the former address of the Debtor, and Gwyn testified that he never received or saw the letter. Gwyn further testified that the first notice that he received alleging that the Debtor was in default was on or about October 2, 2004. The Court need not resolve this dispute.

10

without penalty if the Debtor follows certain procedures. The prepayment premium is to apply any time the Debtor attempts to make an additional principal payment that is not specifically authorized by the terms of the Promissory Note.[8] According to Gwyn's testimony, the Debtor never made any payments to GMAC that would trigger the application of the prepayment premium. Indeed, the Promissory Note forbade the Debtor from making any prepayment of the principal balance before December of 2006, and the Debtor never made any pre-petition payments on the Promissory Note after April 1, 2003.

Paragraph 23.1 of the Deed of Trust[9] allows GMAC to assess a release fee against the Debtor

---

[8]Paragraph 6 of the Promissory Note contains the applicable provisions concerning prepayment; it provides:

> On or after, but not prior to, December 31, 2006 . . . and upon giving Lender not less than thirty (30) days' nor more than forty-five days (45) days' prior written notice . . . Borrower may prepay the Note . . . . If Prepayment Notice is given by Borrower to Lender pursuant to this Article 6, the principal balance of this Note and the other sums required under this Article shall be due and payable on the Prepayment Date. Lender shall not be obligated to accept any prepayment of the principal balance of this Note unless it is accompanied by all sums due in connection therewith.
>
> If notwithstanding the prohibition against prepayment prior to the Permitted Prepayment Date, Borrower prepays all or a portion of the unpaid principal balance of the Note prior to such date . . . there shall be immediately due and payable in addition to accrued interest and any other sums due Lender at the time of prepayment, a prepayment premium equal to . . . .
>
> If a Default Prepayment (defined herein) occurs, Borrower shall pay to Lender the entire Debt . . . .
>
> For purposes of this Note, the term "Default Prepayment" shall mean a prepayment of the principal amount of this Note, made during the continuance of any Event of Default or after an acceleration of the Maturity Date under any circumstances . . . ."

[9]The Release Fee provision, located in paragraph 23.1 of the Deed of Trust and Security Agreement, states:

The Lender shall notify the Trustee of payment in full of the Obligation and shall,

11

under certain circumstances, which, like the prepayment premium, requires the occurrence of a condition precedent before it may be assessed against the Debtor.  Under Paragraph 23.1 of the Deed of Trust, the release fee is payable when the trustee of the Deed of Trust is required to reconvey the Property.  The trustee of the Deed of Trust has not been required by any party to make any conveyance that would trigger the release fee.

During the hearing, GMAC agreed that (1) the Debtor did not make any prepayments to which the prepayment penalty would apply and (2) the trustee of the Deed of Trust has not been required to make any reconveyance of the property.  GMAC argues, however, that the prepayment penalty and release fee are due to GMAC pursuant to Paragraph 4 of the Promissory Note, which states:

> (a) The whole of the principal sum of this Note, (b) interest, default interest, late charges, and <u>other sums as provided in this Note</u>, the Security Instrument or the Other Security Documents (defined below), (c) <u>all other moneys agreed or provided to be paid by Borrower</u> in this Note, the Security Instrument or Other Security Documents . . . shall without notice become immediately due and payable at the option of the Lender if any payment required in this Note is not paid . . . or on the happening of any other default . . . .

Promissory Note ¶ 4(a) (emphasis added).

GMAC focuses on the phrases "other sums" and "all other moneys agreed or provided to be

---

upon payment of the Release fee (defined below), surrender this Deed of Trust to the Trustee for cancellation.  Upon receipt of such notification and upon payment by the Borrower of the Trustee's expenses, the Trustee (and if required by law the Lender) shall reconvey without warranty or covenant any portion of the property then held hereunder to the Borrower or to the person or persons legally entitled thereto by an instrument duly acknowledged in form for recording.  The recital in such reconveyance of any matter of facts shall be conclusive proof of the *truthfulness* thereof.  Release Fee shall mean an amount equal to ½ of one percent of the principal of the Loan outstanding at the time of such Release, provided, however, that no Release Fee shall be due if Lender or an affiliate of Lender makes a loan to the Borrower to repay the Debt.

paid by Borrower" as a basis for its purported right to assess the prepayment premium and release

fee against the Debtor insofar as the prepayment premium and release fee are incorporated into the

phrases "other sums as provided in [the] Note" and/or "other moneys agreed or provided to be paid

by Borrower in [the] Note, the Security Instruments or Other Security Documents." GMAC then

argues, a priori, that since these charges are included in the language of Paragraph 4, they are due

upon default regardless of the fact that the preconditions for their application, as provided in other

paragraphs of the Loan Documents, have not been met.

The Court does not agree with GMAC's interpretation of the Loan Documents. GMAC is

not entitled to a prepayment premium or a release fee as part of its pre-petition claim for at least three

reasons, all of which are based on recognized rules of contract interpretation.[10]

    a.    <u>The Specific Provisions Qualify the General Provisions</u>

The Promissory Note and Deed of Trust have very specific provisions governing the

assessment of a prepayment premium and a release fee. For GMAC to have the right to charge the

Debtor a prepayment premium or a release fee, there must first be an unauthorized prepayment of

the principal balance or a reconveyance of the Deed of Trust. <u>See</u> <u>In re Carr Mill Ltd. Partnership</u>,

201 B.R. 415, 420 (Bankr. M.D.N.C. 1996)(holding that "prepayment is an obvious and necessary

condition to the enforcement of the prepayment penalties"). Contrasted with this specific language

is Paragraph 4 of the Promissory Note, which refers to "other sums" and "all other moneys agreed

---

[10]Pursuant to Paragraph 17 of the Note, the contract shall be determined in accordance with North Carolina law. Paragraph 17 reads "this Note shall be governed, construed, applied, and enforced in accordance with the laws of the state in which the Property is located and the applicable laws of the United States of America." North Carolina law recognizes that "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." <u>Hickox v. R&G Group Intern., Inc.</u>, 161 N.C. App. 510, 513 (N.C. App. 2003), citing <u>Land Co. v. Byrd</u>, 299 N.C. 260, 262 (1980).

to be paid by Borrower." The general language of Paragraph 4 must yield to the specific language of Paragraph 6 of the Promissory Note and Paragraph 23.1 of the Deed of Trust. Specific provisions in a contract generally qualify the meaning of the more general provisions. Ray D. Lowder, Inc. v. North Carolina State Highway Com., 217 S.E.2d 682, 693 (N.C. Ct. App.)(stating that this rule "is not an ironclad rule to be followed in every case. It is merely one rule helpful in arriving at an interpretation of a contract."), cert. denied, 218 S.E.2d 467 (N.C. 1975); Restatement (Second) Contracts, § 203(c) ("[S]pecific terms and exact terms are given greater weight than general language. . . ."); see also China Nat. Metal Products v. Apex Digital, Inc., 379 F.3d 796, 800 (9th Cir. 2004). The specific conditions precedent for the assessment of the prepayment premium and the release fee have not been met. That is, no prepayment or release has occurred. Since these preconditons have not been met, the prepayment premium and the release fee are not "provided in the Note" nor are they "agreed or provided to be paid by Borrower." Nothing in Paragraph 4 indicates that these conditions precedent are to be waived if the Debtor defaults and GMAC accelerates the obligations due under the Promissory Note. Without the occurrence of the specific conditions precedent, no such charges are owed by the Debtor.

   b.    The Interpretation Should Give Meaning to All Provisions

An interpretation of a contract "which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. . . ." Restatement (Second) Contracts § 203(a). See also Woods v. Nationwide Mut. Ins. Co., 246 S.E.2d 773, 777 (N.C. 1978)("The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect."); Littlefield v. Acadia Ins. Co., 392 F.3d 1, 10 (1st Cir. 2004). To give a reasonable, lawful, and effective meaning to all the terms

of the Loan Documents, a prepayment premium or a release fee must be actually due under the specific terms of the Promissory Note and Deed of Trust before such charges may be assessed against the Debtor.  Charging a prepayment premium and a release fee when those charges are not otherwise owing under the specific provisions governing those charges simply ignores those provisions; such interpretations are not favored.  GMAC argues that the Court should ignore the provisions of Paragraph 6 of the Promissory Note and Paragraph 23.1 of the Deed of Trust just because the Debtor is in default.  Under GMAC's interpretation, the Debtor would not owe a prepayment premium or a release fee under the specific provisions governing the imposition of those fees, but at the same time would owe those fees under the general language governing default.  Since it is presumed that the parties intended for all of the provisions of the Loan Documents to have meaning, such a reading is unreasonable and likely contrary to the intent of the parties.

       c.     <u>Ambiguities Should be Construed Against the Document Preparer</u>

"Any ambiguity in a written contract is construed against the party who prepared the writing." <u>Adder v. Holman & Moody, Inc.</u>, 219 S.E.2d 190, 196 (N.C. 1975)("The heart of a contract is the intention of the parties. The intention of the parties must be determined from the language of the contract, the purposes of the contract, the subject matter and the situation of the parties at the time the contract is executed."). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." <u>Register v. White</u>, 599 S.E.2d 549, 553 (N.C. 2004); see also <u>Canada Life Assur. Co. v. Estate of Lebowitz</u>, 185 F.3d 231, 235 (4th Cir. 1999).  GMAC and the Debtor offer conflicting interpretations of the terms "other sums" and "all other moneys agreed or provided to be paid by Borrower" as stated in Paragraph 4 of the Promissory Note.  GMAC advocates that the terms apply to all possible charges

that are provided for in the Promissory Note and Deed of Trust regardless of whether the conditions precedent for those charges have occurred. The Debtor argues that "other sums" and "all other moneys agreed or provided to be paid by Borrower" only mean those fees and charges that are actually due and payable under the terms of the Promissory Note and the Deed of Trust, and that Paragraph 4 of the Promissory Note did not remove any conditions precedent for their assessment. For example, under the Debtor's interpretation, the Debtor would owe sums for GMAC's payment of property taxes on the Property. That expense was actually incurred by GMAC, and it would be reasonable to assume that the cost, which was properly charged to the Debtor under the Promissory Note because the condition precedent for its assessment (i.e., GMAC's payment of it) had been met, is the type of expense to which the terms "other sums" and "all other moneys agreed or provided to be paid by Borrower" apply. The ambiguity created by these conflicting interpretations of the Promissory Note must be resolved against its drafter, GMAC.

Using accepted rules of contract interpretation, neither the prepayment premium nor the release fee is payable merely because the Debtor has defaulted on the Promissory Note. The assessment of a prepayment premium and a release fee are dependent on specific conditions precedent, which have not occurred. The specific criterion for their assessment takes precedence over the more general terms of Paragraph 4(a) of Promissory Note. Harmonizing all provisions of the Promissory Note and Deed of Trust together gives effect to the intent of the parties. To the extent that there is latent ambiguity in Paragraph 4, it must be resolved against GMAC. Therefore, GMAC may not assess the $201,893.13 prepayment premium and the $12,818.36 release fee against the Debtor.

5.    Servicer Administrative Fee

GMAC asserts that it is owed a Servicer Administrative Fee of $310.00. The Debtor did not

object to the Servicer Administrative Fee, and as such, GMAC will be allowed a Servicer

Administrative Fee of $310.00.

6.    Miscellaneous Account Fees

GMAC asserts that it is owed Miscellaneous Account Fees of $85.00. The Debtor did not

object to the Miscellaneous Account Fees, and as such, GMAC will be allowed Miscellaneous

Account Fees of $85.00.

7.    Property Protection Advances

GMAC asserts that it is owed Property Protection Advances of $82,707.15. The Proof of

Claim states,

> [T]hese costs and expenses include (but are not limited to) taxes and other charges, insurance premiums, cost of reappraisal of the Property, legal fees and disbursements of the Lender, and other expenses as provided for in the Promissory Note and Deed of Trust and Security Agreement. (The sum of these advances as of the Petition Date was $27,083.85).

Certainly the $27,083.85 pre-petition Property Protection Advances, which consist solely of

prepetition attorneys' fees, will be allowed as part of the Proof of Claim. With one exception, the

remaining Property Protection Advances of $55,623.30 were incurred entirely or partially post-

petition as set forth in Exhibit 5 of the Anderson Affidavit. All professional fees and charges

incurred post-petition must be brought before the Court pursuant to Section 506(b) and Rule 2016

and cannot be included in a proof of claim. Section 506(b) "applies [only] from the date of filing

through the confirmation date." Rake v. Wade, 508 U.S. 464, 468 (1993). Of the remaining

Property Protection Advances, Exhibit 5 of the Anderson Affidavit shows post-petition legal fees

17

totaling $48,328.30. If GMAC wishes to collect any post-petition attorneys' fees, then it must follow the requirements of Rule 2016 and Section 506(b) and file an application seeking post-petition fees with the Court.

The remaining Property Protection Advances are as follows:

| Date | Description | Amount |
|------|-------------|--------|
| July 26, 2004 | Phase 1 Review | $ 470.00 |
| September 28, 2004 | BOV (Broker's Opinion) | $1,875.00 |
| October 7, 2004 | Credit Check | $ 50.00 |
| November 17, 2004 | Appraisal | $4,000.00 |
| November 22, 2004 | Appraisal Review | $ 900.00 |

Of these, only the July 26, 2004 Phase I Review fee is a prepetition fee. The remaining Property Protection Advances were incurred post-petition, and, as such, should be included in any Section 506(b) fee application that GMAC wishes to file.[11]

GMAC will be allowed a total pre-petition claim of $27,553.85 for Property Protection Advances inasmuch as the Debtor has not objected to those fees.

8.    Late Charges

GMAC asserts that it is owed late charges due in the amount of $19,137.51. The Debtor does not dispute the amount of the late charges.[12]  Thus, GMAC will be allowed late charges of $19,137.51.

---

[11] Section 506(b) states that to the extent an allowed secured claim is secured by property the value of which is greater than the amount of the claim, the secured party may receive "any reasonable fees, costs, or charges provided for under the [loan] agreement." Arguably paragraph 21(b) of the Promissory Note provides for the collection of fees expended by GMAC in this case, but any post-petition, pre-confirmation fees and charges must be brought before the Court pursuant to Section 506(b) and Rule 2016.

[12] Debtor's Supplemental Memorandum in Support of Debtor's Objection to Claim filed May 17, 2005.

9.    Outstanding Escrow Advances

GMAC asserts that it is owed $90,408.42 for Outstanding Escrow Advances consisting of

Real Estate Tax Advances of $49,062.75 and Insurance Advances of $41,345.67.

a. Real Estate Tax Advances

Exhibit 6 of the Anderson Affidavit shows payment by GMAC of the 2003 real property tax

bill to Guilford County Tax Department on February 24, 2004 in the amount of $49,062.75.  The

Debtor does not object to this claim.  Hence, GMAC will be entitled to claim $49,062.75 as an

Outstanding Escrow Advance owing by the Debtor.

b. Insurance Advances

The evidence showed that the insurance on the Debtor's property lapsed for approximately

a six-month period in late 2002 and early 2003.  Gwyn testified that a dispute with the Debtor's

insurance carrier resulted in a lapse of insurance in the fourth quarter of 2002.  When the Debtor

became aware that the insurance had lapsed, Gwyn testified that the Debtor immediately obtained

insurance through another insurance carrier.  Debtor's Exhibit 1, entitled "Evidence of Property

Insurance," showed that the Debtor obtained insurance on the Property effective for the period of

August 19, 2003 through August 19, 2004.  Gwyn testified that a copy of the Evidence of Property

Insurance was provided to GMAC.  Other than the one lapse in coverage, Gwyn testified that Debtor

had always maintained insurance on the Property.  Gwyn further testified that, at that time, the

annual insurance costs for the Property were $8,313.00.[13]  Lastly, Gwyn testified that the Property

suffered no damages during the period that the insurance lapsed.

---

[13]Debtor's Supplemental Memorandum in Support of Debtor's Objection to Claim, filed
May 17, 2005, states that the annual cost was $8,316.00.

19

Exhibit 1 of the Affidavit of Patricia Skalla[14] shows that GMAC paid $43,571.09 to "force place" insurance on the Property for the period of October 1, 2003 through October 1, 2004. The invoice date is April 18, 2005. It appears that the insurance was retroactively purchased for the time period noted above.

GMAC purchased insurance on the Property at a cost of $43,571.09, of which it seeks to collect $41,345.67 from the Debtor. The Debtor objects for several reasons. First, GMAC placed insurance on the Property for a period when the Debtor already had insurance coverage on the Property. Debtor's Exhibit 1 shows that on August 22, 2003, the Debtor purchased a policy insuring the Property from August 19, 2003 through August 19, 2004. Gwyn testified that GMAC was provided with a copy of the Evidence of Property Insurance. Yet, GMAC purchased a policy on the Property covering the period of October 1, 2003 through October 1, 2004. Second, by the admission of both parties, GMAC purchased insurance for a period of time that had already passed. Third, the date on the invoice provided by GMAC is April 18, 2005. Since GMAC purchased the insurance on April 18, 2005, this charge is subject to Section 506(b) and is not allowable as a prepetition claim.

Because GMAC has not shown that it incurred any prepetition insurance expense, the $41,345.67 charge will not be allowed as part of GMAC's prepetition claim. This ruling is without prejudice to GMAC's right to claim that expense in a subsequent Section 506(b) application.

### D. CONCLUSION

On the Petition Date, GMAC was owed $3,105,791.03, which amount is calculated by adding the following figures:

---

[14]Patricia Skalla is the manager of Althans Insurance Agency, Inc.

20

| | |
|---|---|
| Current Principal Balance | $2,563,671.12 |
| Interest Due at Note Rate | $ 331,673.40 |
| Interest Due at Default Rate | $ 114,297.40 |
| Prepayment Premium | $ 0.00 |
| Release Fee | $ 0.00 |
| Servicer Administrative Fee | $ 310.00 |
| Miscellaneous Account Fees | $ 85.00 |
| Property Protection Advances | $ 27,553.85 |
| Late Charges | $ 19,137.51 |
| Outstanding Escrow Advances | $ 49,062.75 |
| Total | $3,105,791.03 |

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

JUN 2 2 2005

THOMAS W. WALDREP, JR.
United States Bankruptcy Judge

21

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE:                                      )
                                            )
DEEP RIVER WAREHOUSE, INC.                  )        Case No. 04-52749
                                            )
            Debtor.                         )
                                            )

## CERTIFICATE OF SERVICE

The undersigned clerk certifies that the foregoing MEMORANDUM OPINION was served upon the following parties by mailing a copy of the same by first-class postage prepaid mail addressed as follows:

Robyn C. Whitman, Esquire            Alan D. McInnes, Esquire
Bankruptcy Administrator's Office    Kilpatrick Stockton, LLP
P.O. Box 1828                        Suite 400
Greensboro, NC 27402                 3737 Glenwood Avenue
                                     Raleigh, NC 27612

Bruce Magers, Esquire
Suite 604-C
2990 Bethesda Place
Winston-Salem, NC 27103

Robert E. Price, Jr., Esquire
1144 W. Fourth St.
Winston-Salem, NC 27101

This the 22nd day of June, 2005.


                              By:

                                      Barbara Beane
                                   DEPUTY CLERK