IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE:                                )
                                      )
DEEP RIVER WAREHOUSE, INC.,           )        Case No. 04-52749
                                      )
            Debtor.                   )
_____  )

**MEMORANDUM OPINION**

This matter came before the Court for hearing on August 9, 2005 on the Amended Chapter 11

Plan Filed by Deep River Warehouse, Inc. (the "Debtor") on May 31, 2005, the Motion for

Confirmation of Plan filed by the Debtor on July 19, 2005, and the Modification to Proposed Plan

filed by the Debtor on August 8, 2005.[1]   At the hearing, the Debtor was represented by Robert E.

Price, Jr., GMAC Commercial Mortgage Corporation ("GMAC") was represented by Alan D.

McInnes and David A. Geiger, and Michael D. West was present in his capacity as the United States

Bankruptcy Administrator.

There are four issues before the Court regarding confirmation of the Plan: (1) whether the

Plan is feasible, (2) whether the separate classification of GMAC's unsecured deficiency claim is

proper, (3) what is the appropriate rate of interest for GMAC's secured claim in this case, and

(4) whether the $40,000 tendered by an inside affiliate of the Debtor is sufficient new value to

constitute an exception to the absolute priority rule.  Upon consideration of each issue, the Court

finds that the Plan should not be confirmed.

Based upon a review of the Plan, the Objection of GMAC to the Plan, the evidence presented

---

[1]At the hearing, all parties agreed that the Modification to the Proposed Plan would be
considered along with the Proposed Plan filed on May 31, 2005.  The Court will refer to both
collectively as the "Plan."

at the hearing, the arguments of counsel, and a review of the entire official file, the Court makes the following findings of fact and conclusions of law:

## A. FACTS

1.      In 1997, Scott L. Gwyn ("Gwyn"), the sole shareholder/owner of the Debtor, built a warehouse located at 615 Pegg Road in Greensboro, North Carolina (the "Property"), that is the sole asset of the Debtor.

2.      On June 5, 1997, the Debtor executed a Promissory Note, Deed of Trust and Security Instrument, and Assignment of Rents (the "Loan Documents") with Dynex Commercial, Inc. ("Dynex"), the predecessor of GMAC.   The principal amount of the Promissory Note was $2,800,000.00, and it required monthly payments of $22,782.71 by the Debtor.   The non-default interest rate was a fixed rate of 8.625 percent per annum.

3.      On June 5, 1997, Dynex assigned the Loan Documents to GMAC.

4.      On September 22, 2004 (the "Petition Date"), the Debtor filed a Chapter 11 bankruptcy petition.

5.      On February 24, 2005, this Court entered an Order allowing the Debtor to enter into a Lease with Berco of America, Inc. ("Berco").   The Lease is for a term of five years beginning April 1, 2005 through March 31, 2010.   The Lease provides that Berco will pay $27,792.22 per month for the first thirty-seven months of the Lease term, $29,459.75 per month during months thirty-eight through forty-eight, and $30,048.94 per month for months forty-nine through sixty. Berco will be responsible for all maintenance and repairs on the Property except those concerning the walls and the roof of the Property.

6.      On May 13, 2005, the Debtor filed a Fifth Amended Disclosure Statement (the

2

"Disclosure Statement").  The Court approved the Disclosure Statement as modified in open Court on May 18, 2005.

   7.  On May 31, 2005, the Debtor filed an Amended Chapter 11 Plan.

   8.  On July 6, 2005, GMAC filed an Objection to the Amended Chapter 11 Plan.

   9.  On August 8, 2005, the Debtor filed a Modification to the Proposed Plan.

B.  ANALYSIS

1.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  Success need not be guaranteed but should be more than visionary considering (1) the adequacy of the debtor's capital structure, (2) the earning power of its business, (3) economic conditions, (4) the ability of the debtor's management, (5) the probability of the continuation of the same management, and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. See, e.g., In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 226-227 (Bankr. D.N.J. 2000); In re WCI Cable, Inc., 282 B.R. 457, 486 (Bankr. D. Or. 2002).  The burden of proof is on the debtor to demonstrate the feasibility of its proposed plan to show that the plan has a reasonable prospect of success and is workable.  Success need not be guaranteed or certain.  See, e.g., In re Grandfather Mountain Ltd. Partnership, 207 B.R. 475, 487 (Bankr. M.D.N.C. 1996); In re Atrium High Point Ltd. Partnership, 189 B.R. 599, 609 (Bankr. M.D.N.C. 1995).  "The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so

long as adequate evidence supports a finding of feasibility." 7 Collier on Bankruptcy ¶ 1129.03[11]

(Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev. 2004). As one court noted, "it is clear that

there is a relatively low threshold of proof necessary to satisfy the feasibility requirement." S&P,

Inc. v. Pfeifer, 189 B.R. 173, 182-83 (Bankr. N.D. Ind. 1995), quoting In re Drexel Burnham

Lambert Group, Inc., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

The Debtor argues that the Plan is feasible because the Debtor has a strong tenant leasing the

Property until 2010, which provides highly reliable rental income in an amount sufficient to pay the

payments owed to GMAC under the Plan.[2] Under the Berco Lease, the Debtor's only obligation is

to maintain the roof and walls of the Property. Gwyn testified, without contradiction, that the roof

and walls were in excellent condition and needed no repairs. Further, under the terms of the Plan,

the Debtor will build a reserve of funds, which could be used to fund any repairs that might

unexpectedly arise. Finally, the Debtor argues that there is no reason why the Debtor will not be able

to refinance or pay off the debt in ten years as required by the Plan.

GMAC argues that the Debtor's Plan is not feasible for several reasons. The Debtor will

have to pay for repairs to the walls and roof under the Berco Lease. In addition, the Plan does not

demonstrate how the Debtor will fund the payment of administrative claims in full on the Effective

Date, as required by the Plan. GMAC notes that the Plan provides for funding to come from the

payments due under the Berco Lease and from the $40,000 equity infusion made by Idlewild, but

GMAC argues that this is insufficient because it leaves a $60,000 shortfall with regard to the funding

of administrative claims. Finally, GMAC argues that if GMAC opted for Alternative Treatment B

(payout of $3,000,000 for all claims), then the loan commitment received by the Debtor from Ohio

---

[2]Monthly payments under the Berco Lease are $27,792.22.

National (the "Ohio National Quote") is insufficient because the proposed loan is for only $2,500,000. Gwyn testified that Ohio National would likely lend the Debtor $2,700,000 to $2,800,000 and that Gwyn would lend the Debtor the balance remaining.[3]

Feasibility is established through the testimony of experts and those knowledgeable of the future prospects of the reorganized debtor. The inquiry focuses on the viability of the reorganized debtor and its ability to meet its future obligations, both as provided for in the plan and as may be incurred in operations. See In re Made in Detroit, 299 B.R. 170, 179-80 (Bankr. E.D. Mich. 2003). Particularly important is that the plan proponent demonstrate that any necessary financing has been obtained or is likely to be obtained. See id. "Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." In re Travelstead, 227 B.R. 638, 651 (D. Md. 1998).

This Court finds the Plan feasible for several reasons. First, the Debtor has a positive monthly cash flow under the Berco Lease, which is a solid, reliable source of funds. Berco has made all payments due under the Berco Lease to date. It is unlikely that any repairs will need to be made by the Debtor to the roof or walls of the Property. Second, under the Plan, the Debtor will build a reserve of $120,000 - $150,000 over the first five years of the Plan. This reserve could be used by the Debtor to pay for a tenant upfit for a future tenant if Berco does not purchase the Property or enter into a new lease of the Property, to pay any fees associated with a refinance of the loan with GMAC, to pay monthly payments due to GMAC under the Plan if the Property is without a tenant

---

[3]Gwyn testified that the terms of the Ohio National Quote were still in negotiation and would be more favorable to the Debtor if an actual loan were sought.

at any time, or to pay for any necessary repairs to the walls or roof of the Property.[4]  Finally, the chances that the Debtor will be able to secure a new loan to pay off GMAC as provided in the Plan are strong.  The Debtor received a quote from Ohio National for financing during the pendency of this bankruptcy case for favorable terms.  It is likely that the Debtor will be able to obtain financing from another lender after the Debtor has established a positive payment history under the Plan.  If the Debtor defaults in these endeavors, then the Plan provides that the Property is abandoned to GMAC.  The Plan is feasible.

### 2.  Classification

The second issue before the Court is whether the Plan properly classifies GMAC's unsecured deficiency claim in a separate class from other unsecured creditors.

Subsection 1122(a) of the Bankruptcy Code provides that, except as provided in subsection (b), a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  Subsection (b) states that a plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

The explicit language of Section 1122 requires substantial similarity between claims that are placed in the same class but does not require that all substantially similar claims be placed within the same class.  See Grandfather Mountain, supra, at 483.  Section 1122 therefore leaves some flexibility in the classification of unsecured claims.  See id.

GMAC did not elect to have its claim treated as a fully secured claim pursuant to

---

[4]Testimony of Gwyn.

Section 1111(b).  Thus, GMAC holds both a secured and an unsecured claim.  The Plan placed the unsecured portion of GMAC's claim in a class by itself (Class 4) and put the unsecured trade creditors in another class (Class 5).  The Debtor argues that the separate classification of GMAC's deficiency claim is proper and that reasons exist to treat the deficiency claim differently than the trade creditors' claim.  The Plan proposes to pay both classes in full.  The Debtor argues that separate classification is justified because the classes will be treated differently if the Plan is unsuccessful.  If GMAC forecloses on the Property, then the Debtor argues that the deficiency claim would be deemed satisfied in full, whereas the claims of trade creditors would receive nothing.  Further, the deficiency claim may be paid through the personal guarantee of Gwyn, but the trade creditors' claim does not have such a source of payment.  Finally, there is no incentive for GMAC to vote in the interest of its unsecured claim because that payment will be made regardless of confirmation of the Plan.

GMAC argues that because the classes receive the same treatment and distribution from the same pool of funds, the classification is an improper attempt to gerrymander the classes and provide the Debtor with an impaired accepting class.  GMAC relies on Bryson Properties, which held that "where all unsecured claims receive the same treatment in terms of the Plan distribution, separate classification on the basis of natural and unnatural recourse claims is, at a minimum, highly suspect."  In re Bryson Properties, XVIII, 961 F.2d 496, 502 (4th Cir. 1992).

There are legitimate reasons for separately classifying a deficiency claim in a given case.  There are inherent differences between a deficiency claim and the claims of trade creditors.  In this case, GMAC's deficiency claim has priority over the trade creditor's claims because GMAC has recourse against Gwyn.  "In short, the recourse claims have a high unsecured priority in chapter 11.

7

The artificial recourse claim has a low priority. These claims, therefore, may not be classified together. If this undeniable truth is acknowledged, the classification veto is dead in the typical real estate reorganization." Carlson, The Classification Veto in Single-Asset Cases Under Bankruptcy Code Section 1129(a)(10), 44 S.C.L. Rev. 565, 592-94 (1993). "The rights afforded to holders of deficiency claims are simply greater [than] (and therefore different from) the rights given to other unsecured creditors." In re SM 104 Limited, 160 B.R. 202, 219-220 (Bankr. S.D. Fla. 1993)("The application of this standard to a class consisting of both general unsecured claims and § 1111(b) claims can lead to anomalous results.").

Practically speaking, the objective of the deficiency creditor is at odds with the objective of other unsecured creditors. Unsecured creditors have no collateral that motivates them in the decision-making process. See, e.g., In re Montgomery Court Apartments, 141 B.R. 324, 355 (Bankr. S.D. Ohio 1992)("[the undersecured creditor] has every incentive to vote its large unsecured deficiency claim to affect the treatment of its secured claim by defeating confirmation of any plan.")(emphasis in original); In re Aztec Company, 107 B.R. 585, 587 (Bankr. M.D. Tenn. 1989)("if classified with the recourse creditors . . ., [deficiency creditor] would have every incentive to vote its large deficiency claim to affect the treatment of its secured claim by defeating confirmation of any plan.").

There are clearly limitations on the debtor's power to classify claims. In Bryson Properties, the Fourth Circuit stated:

> Section 1122 requires substantial similarity between claims that are placed in the same class. It does not, however, require that all substantially similar claims be placed within the same class, and it grants some flexibility in classification of unsecured claims. Nonetheless, as several courts have held, there is a limit on the debtor's power to classify claims:

8

> Although the proponent of a plan or reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor's power to classify creditors . . . The potential for abuse would be significant otherwise . . . If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic property rights, the plan cannot be confirmed.

Bryson Properties, supra, at 961. The Fourth Circuit went on to state that "although separate classification for similar classes may not be prohibited, it 'may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.'" Id. Other than these statements, the Fourth Circuit has given no general guidance on the issue of separate classification of claims in a Chapter 11 case.

From the guidance of Section 1122 and the Bryson Properties case, it is clear that (1) claims in the same class must be "substantially similar"; (2) even "substantially similar" claims are not required to be placed in the same class; and (3) "substantially similar" claims may be classified separately if the reason for the classification is not solely to obtain the vote of an impaired accepting class. From these axioms, it must be observed that, in the Fourth Circuit, the separate classification of even substantially similar claims is permissible if the debtor can offer any reason "which will withstand scrutiny," which means not "for the purpose of manipulating voting." Id.

Whether a legitimate (i.e., non-manipulative) business reason exists to justify the separate classification of claims is a question of fact, reviewable under the clearly erroneous standard. See, e.g., In re Boston Post Road Ltd Partnership, 154 B.R. 617, 621 (D. Conn. 1993); In re Johnston, 140 B.R. 526, 528 (Bankr. 9th Cir. 1992); In re Lumber Exchange Building Ltd Partnership, 134 B.R. 354, 357 (D. Minn. 1991). Bankruptcy courts have broad discretion in classifying claims under

9

Section 1122.  See In re Elmwood, Inc., 182 B.R. 845, 849 (D. Nev. 1995); In re Baldwin Park

Towne Center, Ltd., 171 B.R. 374, 377 (Bankr. C.D. Cal. 1994).   Congress intended to give

bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case.

See In the Matter of Jersey City Medical Center, 817 F.2d 1055, 1060-61 (3rd Cir. 1987); In re

Chateaugay Corporation, 177 B.R. 176, 186 (S.D.N.Y. 1995).

> The separate classification of deficiency claims from other unsecured claims is an
> issue that has been hotly debated.  Separate classification is not in itself evidence that
> the debtor is attempting to manipulate the vote.  The Seventh Circuit has stated: "We
> cannot accept the proposition . . . that separate classification of a § 1111(b) claim is
> nearly conclusive evidence of a debtor's intent to gerrymander an affirmative vote
> for confirmation."

In the Matter of Woodbrook Associates, 19 F.3d 312, 318 (7th Cir. 1994).  The Ninth and First

Circuits have agreed with the Woodbrook court.

> I begin by disagreeing with the Greystone approach to classification.  It places an
> unfair burden on the debtor to prove a negative.  The debtor has to show that it has
> a reason for the separate classification of the deficiency claim independent of its need
> to get an affirmative vote of an impaired class for confirmation.  This creates a bias
> against the debtor that is not specified in the Code.

In re Baldwin Park Town Center, Ltd., 171 B.R. 374, 377 (Bankr. C.D. Cal. 1994).

> This court is unable to find an "unlawful purpose" in the act of separately classifying
> a claim holding rights greatly in excess of other unsecured creditors.  Nor does this
> court find such a classification to be an improper manipulation.  A far better example
> of manipulation can be found in the failure of a deficiency claim holder to exercise
> a § 1111(b) election, not because it desires the same treatment afforded unsecured
> creditors, but because it is certain that the combination of its deficiency claim with
> the claims of other unsecured creditors will be the death knell of the plan.  The
> obvious drafting goal of every Chapter 11 debtor is to gain approval of a plan.  A
> debtor's attempt to satisfy a requirement of confirmation, that is § 1129(a)(10), by
> separately classifying claims with decidedly different rights should not be the target
> of criticism.

In re Gato Realty Trust Corporation, 183 B.R. 15, 23 (Bankr. D. Mass. 1995).

> While some jurisdictions reject the notion that the separate classification of deficiency and

trade claims, in and of itself, indicates an improper manipulation, the Fourth Circuit has stated: "Where all unsecured claims receive the same treatment in terms of the Plan distribution, separate classification on the basis of natural and unnatural recourse claims is, at a minimum, highly suspect." Bryson Properties, supra, at 961.  The Fourth Circuit did not say that it rejected "natural" and "unnatural" recourse claims as a basis for separate classification.[5]  It only said that such a reason was "highly suspect" in the context of a plan that treated both unsecured classes the same.

The Grandfather Mountain court found that  the differences between a deficiency claim and other unsecured claims - "significant, legally distinguishing" differences - warranted separate classification within the Bryson Properties parameters.  Grandfather Mountain, supra, at 484.  The Grandfather Mountain court also relied upon the fact that the two unsecured classes, one for the deficiency claim and one for trade claims, were treated differently under the plan.  Thus, the prevailing precedent in the Fourth Circuit requires that trade creditors and deficiency creditors receive different treatment under the Plan if they are to be classified separately.

Several reasons exist for the separate classification of GMAC's deficiency claim and the unsecured trade creditor claims in the Debtor's Plan.  GMAC has a source outside the Plan from which to recover its deficiency claim - the guaranty of Gwyn.  GMAC's objectives clearly contradict the objectives of other unsecured creditors.  GMAC has strenuously objected to the Plan and  will likely object to any plan of reorganization that the Debtor proposes.  The current Plan proposes to pay GMAC's deficiency claim in full, hence, better treatment under a different plan is unlikely.  GMAC apparently wishes to prevent confirmation of the Plan and foreclose on the Property.  "Even

---

[5]In fact, the court noted that the Aztec decision found that the "existence of 'natural' and 'unnatural' recourse claimants is [a] factor to consider but is not outcome determinative." Bryson Properties, supra, at 502 n. 9.

when the separate classes are treated substantially alike, a segregation may be possible if the claimants in one class are motivated by what the Sixth Circuit has called 'non-creditor interest.'" Riesenfeld, Classification of Claims and Interests in Chapter 11 and 13 Cases, 75 Cal. L. Rev. 391, 401 (1987).

Another factor to consider is the size of GMAC's deficiency claim versus the other unsecured claims. The claims of the trade creditors total $18,088; GMAC's deficiency claim totals $49,362.12.[6] In approving separate classification of a deficiency claim from other unsecured claims, one court stated: "In both amount and character, [the two claims] differ significantly. Indeed if [the debtor] had classified the claims together, an objection based on their dissimilarity might have been sustainable." In re Club Associates, 107 B.R. 385, 401 (Bankr. N.D. Ga. 1989).

Although the Court understands and recognizes that reasons may exist to separately classify deficiency claims and trade creditor claims, the Debtor in this case has failed to provide important indicia that the motive behind the separate classification is non-manipulative. The Plan proposes to treat both the trade creditors and the GMAC deficiency claim the same, which makes the separate classification, "at a minimum, highly suspect." This fact leads the Court to conclude that such classification is improper in this case. If the two classes received different treatment under the Plan, for legitimate reasons, then the separate classification might be viewed in a different light.

### 3.  Cramdown Rate of Interest

Section 1129(b)(1) of the Bankruptcy Code allows a debtor to meet the requirements of Section 1129(a)(8) "if the plan does not discriminate unfairly, and is fair and equitable, with respect

---

[6]On May 31, 2005, this Court determined the amount of GMAC's claim to be $3,105,791.03. An additional $43,571.09 was awarded for pre-petition insurance expenses on August 8, 2005.

to each class of claims or interest that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). In order for a plan to be fair and equitable to a secured creditor, the plan must provide for one of three treatments. First, the plan may provide that (a) the secured creditor retains its liens securing its claim, and (b) the secured creditor will receive deferred cash payments totaling at least the allowed amount of its claim, of a value on the effective date of the plan that is at least the value of the creditor's interest in the estate's interest in the collateral. See 11 U.S.C. § 1129(b)(2)(A)(I). Second, the plan may provide for the collateral of the secured creditor to be sold, with liens to attach to proceeds of the sale. See 11 U.S.C. § 1129(b)(2)(A)(ii). Third, the plan may provide for the realization by the secured creditor of the indubitable equivalent of its claim. See 11 U.S.C. § 1129(b)(2)(A)(iii).

In this case, it is uncontroverted that GMAC will retain its liens securing its claim. The issue is whether the proposed deferred payments in the Debtor's Plan will provide GMAC with the present value of its interest in the collateral.[7]

The Plan proposes to treat GMAC's secured claim in one of two ways. Under Alternative Treatment "A", GMAC will retain its liens, GMAC's claim will bear interest at the rate of 5.5% per annum, and GMAC will receive monthly payments of $22,500 from the Effective Date of the plan through September 30, 2010; at that time, the interest rate will increase to 6% per annum for an additional five years, at the end of which all remaining amounts owed will become due in full. No prepayment penalty will be allowed. Under Alternative Treatment "B", GMAC will accept the sum of $3,000,000 in full satisfaction of both its secured and unsecured claims.

---

[7]On March 14, 2005, this Court determined the value of GMAC's collateral to be $3,100,000.00.

The present value dispute arises under Alternative Treatment "A."  GMAC objects to the blended interest rate of 5.75% proposed by the Debtor and argues that an interest rate of 5.75% is insufficient for the Debtor to pay the present value of GMAC's claim.  The Bankruptcy Code does not specify how bankruptcy courts are to calculate the appropriate "cramdown" interest rate for lenders.  Till v. SCS Credit Corp., 541 U.S. 465, 473 (2004).  The Court must therefore determine what interest rate will provide GMAC with the present value of its claim.  GMAC argues that an appropriate cramdown rate of interest is 6.5% to 6.75% in this case.

Most courts agree that the appropriate rate of interest to provide the present value of a secured claim is the market interest rate.  See, e.g., Till v. SCS Credit Corp., 541 U.S. 465, 472 (2004)(present value is closely tied with the "condition of the financial market"); In re Bryson Properties, 961 F.2d 496, 500 (4th Cir. 1992)(courts should consider the prevailing market rate for a loan of equal terms); In re Memphis Bank & Trust Co., 692 F.2d 427, 431 (6th Cir. 1982)(courts must use the current market rate of interest used for similar loans in the region); In re Grandfather Mountain, supra, at 487 (the "market rate" must be used in order to satisfy the present value requirement); In re Birdneck Apartment Assoc., 156 B.R. 499, 504 (Bankr. E.D. Va. 1993)(proper test to determine present value for cramdown is the market interest rate for loans of like terms).  However, there is little agreement among courts regarding the method used to calculate the market interest rate.

Four different methods have been used by courts to determine the appropriate cramdown interest rate.  Under the coerced loan method, the court treats any deferred payment of an obligation under a plan as a coerced loan, and the rate of return with respect to such loan must correspond to the rate that would be charged or obtained by the creditor making a loan to a third party with similar

terms, duration, collateral, and risk.  7 <u>Collier on Bankruptcy</u> ¶ 1129.06[1][c][ii][B] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev. 2004).  The coerced loan method was widely used in the Sixth Circuit prior to <u>Till</u>.  <u>See</u> <u>In re American Homepatient, Inc.</u>, ___ F.3d ___, at 5, WL 1949548 (6th Cir. August 16, 2005).  In <u>In re Byrd Foods, Inc.</u>, 253 B.R. 196, 200 (Bankr. E.D. Va. 2000), the court stated that applying the coerced loan method to determine the appropriate cramdown interest rate would be "catastrophic" in a complex Chapter 11 case.

Under the presumptive contract rate method, the court uses the negotiated contract rate between the parties, subject to adjustment based upon the particular facts of the case, to determine the appropriate cramdown interest rate.  <u>See</u> <u>The Chapter 11 Plan: Proposal, Confirmation and Effect of Confirmation</u>, 870 PLI/Commercial Law and Practice Course Handbook Series 515, 544 (November-December 2004).  In <u>In re Monnier</u>, the Eighth Circuit used the contract rate of interest because neither party presented sufficient evidence to determine a market rate.  <u>In re Monnier Bros.</u>, 755 F.2d 1336, 1339 (8th Cir. 1985).

Under the cost of funds method, the appropriate interest rate is the cost that the creditor would incur to obtain the cash equivalent of the collateral (i.e., the interest rate that the creditor would pay on a loan of an amount equal to the value of the collateral).  <u>See</u> <u>The Chapter 11 Plan: Proposal, Confirmation and Effect of Confirmation</u>, 870 PLI/Commercial Law and Practice Course Handbook Series 515, 544 (November-December 2004).

In <u>Till</u>, the Supreme Court found that each of the methods identified above suffers from one or more serious flaws.  <u>Till</u> at 477.  The Court said that all three methods were complicated, imposed significant evidentiary costs, and aimed to make each individual creditor whole rather than to ensure that the debtor's payments had the required present value.  <u>Id</u>.

The final and most widely accepted method used to determine a cramdown interest rate is the formula rate or time-value of money approach. Under the formula method, the bankruptcy court begins by looking to a national prime rate, reported daily in the press, which reflects the financial market's estimate of the rate that a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the risk of default. Because bankruptcy debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. See Till v. SCS Credit Corp., 541 U.S. 465, 478-9 (2004). Numerous courts have used the formula method to determine the appropriate cramdown interest rate. See, e.g., Till v. SCS Credit Corp., 541 U.S. 465, 472 (2004)(applying the formula rate in a Chapter 13 case); In re Bryson Properties, 961 F.2d 496, 500 (4th Cir. 1992)(in determining the discount rate, courts should consider the prevailing market rate for a loan of equal terms, with due consideration to the quality of the security and the risk of subsequent default); In re Grandfather Mountain Limited Partnership, 207 B.R. 475, 490 (Bankr. M.D.N.C. 1996)(the court should start with a no-risk interest rate and add a risk factor); In re Birdneck Apartment Assoc., 156 B.R. 499, 504 ((Bankr. E.D. Va. 1993)(the proper test to determine present value for cramdown is the market interest rate for loans of like terms with due consideration for the quality of the collateral and the risk of subsequent default); In re Byrd Foods, Inc., 253 B.R. 196, 200 (Bankr. E.D. Va. 2000)(the establishment of a risk-free rate of interest, together with the identification of the particular risk factors present in the case is sufficient to conclude the rate of interest).

In Till, the Supreme Court found that the formula approach was the best of the four methods, stating, "the formula approach entails a straightforward, familiar, and objective inquiry, and

minimizes the need for potentially costly additional evidentiary proceedings." Till at 479. The Supreme Court stated that the formula method depended only on the prime rate of interest, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or prior interactions with the debtor. See Id. at 480. The Court stated, "for these reasons, the prime-plus or formula rate best comports with the purposes of the Bankruptcy Code." Id.

Till was a Chapter 13 case, and the Supreme Court was not called upon to state whether its holding applied to Chapter 11 cases. Further, there are few reported decisions that have applied or rejected Till in a Chapter 11 case. See In re Prussia Assoc., 322 B.R. 572, 585 (Bankr. E.D. Pa. 2005). Several courts have found the Till decision relevant to the cramdown interest rate issue in Chapter 11. See In re Prussia Assoc., 322 B.R. 572, 585 (Bankr. E.D. Pa. 2005)(finding that the degree to which Till is controlling in a Chapter 11 case is undecided, but it certainly has relevance). The Prussia court found Till to be instructive on the proper use of the formula method but not controlling insofar as mandating the use of the formula method. See Prussia at 585. At least one court has found that Till does apply in a Chapter 11 case. See In re LWD, Inc., 2005 WL 567460 (Bankr. W.D. Ky. Feb. 10, 2005). Further, several commentators have argued that Till's formula approach applies to Chapter 11 cases as well as Chapter 13 cases, noting that the two are not all that dissimilar. See 7 Collier on Bankruptcy ¶ 1129.06[1][c][I] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev. 2004)("The relevant market for involuntary loans in chapter 11 may be just as illusory as in chapter 13.")

The Prussia court stated that the Till decision strongly suggests that its decision applies in Chapter 11 cases. Citing to similar cramdown provisions in Chapter 11, the Supreme Court

observed that "the Bankruptcy Code includes numerous provisions that, like the cramdown provision, require a court to discount . . . a stream of deferred payments back to their present dollar value to ensure that a creditor receives at least the value of its claim.  We think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions."  Prussia at 588, citing Till at 473-474.

The Sixth Circuit recently refused to adopt the formula method in all Chapter 11 contexts. Examining footnote 14 from Till, which said that "when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce," the Sixth Circuit found that the market rate should be applied where there exists an efficient market.  In re American Homepatient, Inc., __ F.3d __, 2005 WL 1949548 (6th Cir. August 16, 2005), citing Till at 476 n.14.

The Court does not have to determine whether Till applies in all Chapter 11 cases in order to find that the formula approach is the proper approach to apply in this case.  The Court relies on In re Bryson Properties, 961 F.2d 496 (4th Cir. 1992), and In re Grandfather Mountain, 207 B.R. 475, 490 (Bankr. M.D.N.C. 1996), in reaching the conclusion that the formula approach is the best approach, under the facts and circumstances of this case, to determine the cramdown interest rate for GMAC.

At the August 9, 2005 hearing, J. Frank Joiner[8] ("Joiner") and Beth Harrelson[9] ("Harrelson") testified that the ten-year United States Treasury Bill rate was the appropriate prime interest rate to use and that it was currently 4.2%.  The Court will use 4.2% as the base market interest rate in this

---

[8] Joiner testified as an expert in the analysis of loans and financial accommodations in general.

[9] Harrelson testified as an expert in commercial mortgage loans.

matter.

Once the base market interest rate has been established, a court must determine the appropriate factor of risk to add to the base interest rate in order to determine the cramdown interest rate. In general, the risk factors considered depend on the amount and quality of the collateral, the risk of default, and the length of the payout period. See, e.g., In re Grandfather Mountain, 207 B.R. 475, 491 (Bankr. M.D.N.C. 1996); In re River Village Associates, 161 B.R. 127, 139 (Bankr. E.D. Pa. 1993); In re SM 104 Ltd., 160 B.R. 202, 232 (Bankr. S.D. Fla. 1993); In re Villa Diablo Assoc., 156 B.R. 650, 653 (Bankr. N.D. Cal. 1993). The "spread" of risk premium which is appropriate in determining the market rate of interest is tied closely to the particular facts of the case. See Grandfather Mountain, supra, at 490. Risk is increased significantly when the loan to value ratio is 100%, but a high grade tenant positively affects that risk. See Grandfather Mountain, supra, at 491. The Till Court found that risk is determined by the amount and quality of collateral, the risk of default, and the length of the payout period. See Till, supra, at 473. Till stated that a risk premium would usually fluctuate between 1% and 3%. See Till, supra, at 480.

When determining risk, factors to consider include the circumstances of the estate, the nature of the collateral, and the duration and feasibility of the reorganization plan. See Prussia, supra, at 590. In Prussia, legitimate questions of feasibility had been raised. However, the creditor did little to overcome the evidence that the debtor's operations were improving apace and that the value of the collateral was appreciating. The Prussia court concluded that the risks to the creditor were neither negligible nor extreme, such that a 1.5% risk factor was fair. Prussia, supra, at 591. The Prussia court also stated that an actual loan commitment was "proof of the pudding" as to the applicable market rate of interest. Prussia, supra, at 590.

Applying the appropriate risk factors, including the quality of the collateral, the risk of default, and the length of the payout period, the Court finds the risk to GMAC in this case to be moderate. The quality of the collateral is high. As testified by Thomas Townes[10] ("Townes"), the collateral itself is a stable property that is appreciating in value. The property has a "world class tenant," Berco of America, Inc. ("Berco"), through 2010. Berco has made substantial improvements to the property and intends to make more improvements. The Berco lease is a triple-net lease wherein Berco pays for the taxes, insurance, and maintenance on the property. The Debtor is only responsible for the walls and roof of the property, which Gwyn testified were both in excellent condition with no repairs needed. Further, due to recent and continuing positive commercial and manufacturing developments in the Triad airport area, where the property is located, there is an upward trend in real estate values. The Debtor's Plan has a more favorable amortization period (eighteen years) than that of most commercial loans (twenty-five years).[11] There is little risk of default by the Debtor under the Plan. As noted, Berco is contractually obligated to lease the property through 2010, at which time Berco has the option to purchase the property.[12] If Berco does not purchase the property or enter into a new lease on the property, then it is likely that another tenant will lease the property. Gwyn testified that, at the end of the five-year Berco lease, the Debtor would have a reserve fund in an amount between $120,000 and $150,000. In the eighteen years since the property was constructed, there has only been one period of more than a year in which no third party

---

[10]Townes testified as an expert in real estate marketing and finance in the Piedmont of North Carolina.

[11]Testimony of Harrelson.

[12]In a deposition taken by GMAC, a representative of Berco testified that Berco intended to exercise its purchase option.

tenant occupied the property.[13]

Harrelson testified that the cramdown interest rate should be 6.5% to 6.75% because the loan is a highly leveraged loan (100%), it is a nonrecourse loan, there is no yield maintenance premium, and there is no protection for GMAC if Berco leaves at the end of the lease.  The Court finds these arguments unpersuasive.  The loan is a highly leveraged loan, but so are most loans in a cramdown situation.  If Berco leaves, then the history of the property, the projected appreciation of the property, and the anticipated demand for warehouse space in the Airport area all indicate that another tenant is likely to lease the property.  The contention that the loan is a non-recourse loan is erroneous. Gwyn personally guaranteed payment of the original Note to GMAC; nothing in the Debtor's Plan purports to affect Gwyn's obligation, and nothing in the record before the Court suggests that Gwyn is not still personally liable for the Debtor's obligations to GMAC.

The experts that testified agreed on the methodology to be used but not on the amount of additional interest that should be attributed to the risks associated with this case.  Townes testified that the appropriate interest rate is the ten-year Treasury rate plus 130 to 150 basis points, for a final rate of 5.5% to 5.7%.  Joiner testified that the appropriate interest rate is the ten-year Treasury rate plus 155 basis points, for a final rate of 5.75%.[14]  Harrelson testified that the appropriate interest rate is the ten-year Treasury rate plus 200 to 250 basis points, for a final rate of 6.2% to 6.7%.

---

[13]Testimony of Gwyn.

[14]Joiner testified that he reviewed the <u>Grandfather</u> analysis and found that the <u>Grandfather</u> court started with the five-year Treasury rate and then added 49% more interest, for attendant risk, in determining the appropriate cramdown rate of interest.  He explained that the blended rate of 5.75% proposed by the Debtor's plan added 39% more interest, for attendant risk, to the ten-year Treasury rate.  Joiner concluded that the lender in the <u>Grandfather</u> faced much more risk than GMAC faces in this case and that a 5.75% interest rate more than adequately covers the risk to GMAC.

The most compelling factor in determining the appropriate cramdown interest rate is the quote from Ohio National, as stated in a letter to the Debtor dated March 11, 2005.[15]  The Ohio National quote outlined a loan to the Debtor in the amount of $2,500,000 at an interest rate of 5.75%.[16]  The Ohio National quote provides for certain provisions that the Debtor's Plan does not: (1) a prepayment penalty and (2) the payment of lease payments directly to the lender.  The Ohio National quote also provides for a personal guaranty from Gwyn and his wife, but that does not constitute a distinction because a personal guaranty by Gwyn already exists.  In light of the positive factors listed above, it is of little consequence that there are slight differences between the terms of the Plan and the Ohio National quote.  As stated by the Prussia court, an actual loan commitment is "proof of the pudding" as to the applicable market rate of interest.  The Court concludes that the blended interest rate of 5.75% represents the market interest rate and is the appropriate cramdown interest rate in this case.

### 4.  New Value and the Absolute Priority Rule

In order to demonstrate that proposed plan treatment is "fair and equitable" as to a class of unsecured creditors, the Debtor must comply with the "absolute priority rule" of Section 1129(b)(2)(B) of the Bankruptcy Code.  The absolute priority rule provides that "a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan."  Bryson Properties, supra, at 503, citing Norwest Bank

---

[15]Gwyn testified that the Debtor had received a commitment letter from Ohio National and that, while it had technically expired, it could still be negotiated with Ohio National and would be valid.

[16]Gwyn testified that the terms of the Ohio National quote terms were still negotiable, that Ohio National had indicated that it would loan from $2,700,000 to $2,800,000, and that the amount and terms would be slightly more favorable to the Debtor if an actual loan was pursued.

Worthington v. Ahlers, 485 U.S. 197, 203 (1988).

Under the terms of the Plan, Idlewild Grading Company, LLC ("Idlewild"), an insider affiliate of the Debtor's equity holder,[17] is to receive all equity in the reorganized debtor.  GMAC argues that the unsecured creditors are not being paid in full (more specifically, they will not be paid in full if the Plan fails).  However, the Plan proposes to pay both classes of unsecured creditors in full by December 31, 2009.  The Debtor argues that GMAC's deficiency claim is paid in full under the Plan, so there is no violation of the absolute priority rule.  In support of its argument, the Debtor notes that the Supreme Court said that the absolute priority rule was violated when a junior class received or retained property when a dissenting unsecured class was not provided for in full under the plan.  See Norwest Bank, supra, at 203.  However, while the unsecured creditors are being paid in full, they are still impaired.  Any alteration of a creditor's legal rights or privileges constitutes impairment.  See In re Club Associates, 107 B.R. 385 (Bankr. N.D. Ga. 1989), aff'd, 956 F.2d 1065 (11th Cir. 1992).  A claim is not impaired by a reorganization plan unless the claim is classified and treated in a manner inconsistent with its pre-petition rights.  Generally, impairment exists when the plan alters rights to which the creditor or interest holder is entitled in some way, even slightly.  See, e.g., In re Valley Park Group, Inc., 96 B.R. 16 (Bankr. N.D.N.Y. 1989); In re Lakeside Global II, Ltd., 116 B.R. 499 (Bankr. S.D. Tex. 1989).  Any alteration of rights constitutes impairment, even if such alteration enhances or has no impact on the value of the claims.  See In re Boston Post Road Ltd. Partnership, 154 B.R. 617 (Bankr. D. Conn. 1993), aff'd, 21 F. 3d 466 (2nd Cir. 1994); In re L&J Anaheim Associates, 995 F.2d 940 (9th Cir. 1993).

Alternatively, the Debtor argues that if the absolute priority rule is violated by the terms of

---

[17]Gwyn, the sole shareholder of the Debtor, is a member of Idlewild.

23

the Plan, then the $40,000 of new value paid by Idlewild fits within the "new value exception" to the absolute priority rule.  See Case v. Los Angeles Lumber Products Co., 308 U.S. 106 (1939).  GMAC argues that the $40,000 new value is an insufficient amount to meet the new value exception.[18]

The infusion of new value in money or money's worth from sources which are not property of the estate, even if from an equity holder, is an independent act that is not per se a violation of the absolute priority rule.  See In re Woodscape Limited Partnership, 134 B.R. 165, 173 (Bankr. D. Md. 1991).  There is much support for the contention that the new value exception to the absolute priority rule survived the enactment of the Bankruptcy Code.  See, e.g., In re 203 North LaSalle Street Limited Partnership, 190 B.R. 567 (Bankr. N.D. Ill. 1995)(noting that the Supreme Court expressly left open the question of whether contributions of new value can support retention of ownership where creditors receive less than full payment); In re Snyder, 967 F.2d 1126, 1128-31 (7th Cir. 1992); In re Union Meeting Partners, 165 B.R. 553 (Bankr. E.D. Pa. 1994); aff'd, 52 F.3d 317 (3rd Cir. 1995).  The Fourth Circuit declined to rule on the existence of the new value exception in Bryson Properties, but did not foreclose its existence.  Two years thereafter, a bankruptcy court in West Virginia said:

> It appears that the Fourth Circuit left the door open for consideration of some limited new capital exception.  The only prohibition in the Fourth Circuit at this point is that the debtor may not propose a plan which gives old equity the exclusive right to contribute new capital and retain their old equity positions as a result of the contribution.

---

[18]Idlewild purchased the equity consideration for $40,000 after the equity consideration was exposed to the market via a public auction that was duly advertised to the general public.  No other qualified bids were received.  Neither GMAC nor the Bankruptcy Administrator objected to the advertisement procedure used by the Debtor.

<u>In re Krish Realty Associates</u>, 174 B.R. 914, 922 (Bankr. W.D. Va. 1994).

What amount is sufficient new value?  GMAC argues that $40,000 is not sufficient because it represents only 1.3% of the $3,100,000 value of the Property.  The Debtor argues that there is little, if any, equity actually in the property and that the property is encumbered entirely by debt.  Joiner testified that the $40,000 equity infusion is substantially more than the actual value of the equity in the Property and is thus worth much more than the equity value in the Property.  Whether new value is sufficient cannot always be determined by a mathematical analysis.  In <u>In re Miami Center Associates, Ltd.</u>, 144 B.R. 937, 942 (Bankr. S. D. Fla. 1992), the court stated that "new value must be reasonably equivalent to what the contributor receives in exchange."  In <u>Miami Center</u>, the debtor's partners paid $2,000,000 to retain an interest in property with a present value of $18,550,000.  <u>Miami Center</u>, 144 B.R. at 942 (Bankr. S. D. Fla. 1992).

A "token" cash infusion will not suffice.  Token cash infusions violate the absolute priority rule because, when the cash infusion is only "token," old equity is receiving the opportunity to purchase new equity interests at a bargain price "on account of" their pre-petition ownership, not "on account of" their cash infusion.  <u>In re Woodbrook Associates</u>, 16 F.3d 312, 320 (7th Cir. 1994).  The bankruptcy court in <u>Woodbrook</u> concluded that the equity infusion in question could not be substantial because it only constituted 3.8% of the total unsecured debt.  The Seventh Circuit could not say that the bankruptcy court's finding was "clearly erroneous" but cautioned against the use of mathematical calculations.  <u>See</u> <u>id</u>. at 315. The Seventh Circuit also noted that "it is difficult to believe that a contribution that is real and that renders a plan feasible would not qualify as 'substantial.'" <u>Woodbrook</u>, <u>supra</u>, at 320.

A mathematical calculation in this case  weighs in favor of the Debtor.  GMAC asks the

Court to consider the relationship between the new value and the value of the Property, but that is an erroneous comparison. Courts look at the ratio of new value to the amount of the <u>unsecured</u> debt, not the value of the property. <u>Woodbrook</u>, <u>supra</u>, at 320 (finding new value was not "substantial" when it only represented 4% of the unsecured debt); <u>In re Duval Manor Associates</u>, 191 B.R. 622, 636 (finding a new value amount of 4.2% of the total unsecured claims substantial). In terms of the ratio of new value to total unsecured debt, the $40,000 equity infusion would be 59.3% of the unsecured debt.

In conclusion, after reasonable advertising and an auction, Idlewild paid a fair market value, perhaps more, for the equity. Further, the new value ratio to total unsecured debt is 59.3%, which this Court certainly considers to be substantial. The treatment of Idlewild in the Plan does not violate the absolute priority rule.

<u>C. CONCLUSION</u>

This Court hereby concludes that the Plan should not be confirmed. The Debtor shall have until October 24, 2005 to file an amended plan and disclosure statement consistent with this Opinion. If an amended plan and disclosure statement are filed, then the Court shall issue an order requiring that objections to the amended disclosure statement be filed by November 4, 2005, and a hearing on the amended disclosure statement be held on November 16, 2005.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**ALL PARTIES TO BE SERVED**